[630 NYS2d 28]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LUIS KEVIN ROJAS, Appellant.

First Department, July 20, 1995

#### APPEARANCES OF COUNSEL

*Gina M. Mignola* of counsel *(Mark Dwyer* and *Deborah L. Morse* on the brief; *Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

*Tina L. Mazza* of counsel, Tarrytown *(Ralls & Mazza,* attorneys), for appellant.

*Harold R. Tyler* of counsel *(Joel A. Kirsch* on the brief), *Patterson, Belknap, Webb & Tyler, L. L. P., amicus curiae.*

#### OPINION OF THE COURT

Tom, J.

Defendant appeals from a conviction of murder and related charges arising out of a shooting in the Greenwich Village area in lower Manhattan on the grounds of ineffective assistance of counsel and improper police-arranged identification procedures. This appeal focuses on, *inter alia,* certain exculpatory evidence, overlooked by counsel, which, had it been investigated and provided to the jury, may well have proved defendant's innocence.

On the morning of November 18, 1990, at shortly before 2:07 A.M., a group of youths, most of whom were college students, consisting of Javier Bueno, Rudy Quesada, Jose Fontanez, Jose Oquendo, brothers Camilo and Carlos Qui-

nones, Joaquine Carrasquillo, Edward Gajadar and Denis Mondesire, were walking south on Broadway in the Greenwich Village section of Manhattan after finishing a night out bowling.

As the youths approached Waverly Place, two men walking uptown, one wearing an orange aviator-style jacket (this individual will be at times referred to herein as the Perpetrator), and an unidentified companion, proceeded toward the young men. As the youths passed the two men, Mr. Oquendo and the individual with the orange jacket bumped into one another (it is unclear if the incident was intentional on the part of either man), which the Perpetrator took as a challenge. An exchange of words followed and the Perpetrator whistled to alert some nearby companions, who ran across Broadway to join the two men.

The Perpetrator subsequently produced a silver handgun, later determined to be a .32 caliber automatic, yelled "You mother f___rs better run", and started firing at the walls of a New York University building. Some of the youths ran, but Mr. Fontanez stood his ground and, essentially, ceded that the Perpetrator had been victorious in the exchange. The friends of the two men began to depart, laughing, and as they left, one of them told the Perpetrator "we should have did them, should have butt them," which apparently meant we should have shot them.

The Perpetrator then handed the gun to a companion wearing a three-quarter-length green coat who began to fire the gun at the group of youths, striking Mr. Bueno in the neck and Mr. Quesada in the leg and buttocks. After the shooting, the Perpetrator's group ran, and were pursued, at a distance, by Mr. Fontanez as far as the BBQ restaurant on 8th Street and University Place, where they paused for a minute. Mr. Fontanez then doubled back to Waverly Place where he flagged down a New York City Police Department patrol car. Mr. Bueno subsequently died from his injuries while Mr. Quesada survived, but his wounds required the emplacement of a steel plate in his leg and lengthy therapy.

The radio run that eight male Hispanics and Blacks had been involved in the shooting of two people on Broadway and Washington Place, one of whom was wearing an orange jacket, was received by New York City Police Officers Glenn Iannotto and Drew Palmer, who immediately proceeded to the Port Authority PATH station at 9th Street and 6th Avenue

because as Officer Iannotto explained, the station provided a means of escape from the area. As they entered the station, the officers observed a large number of people waiting on the platform, so Officer Palmer radioed for other officers to assist them. When a train pulled into the station moments later, Officer Iannotto had two Port Authority police officers detain the train to prevent the escape of any suspects. New York City Police Officers Dean Pecorale and Jill Martin thereafter saw defendant, who was wearing a reversible jacket similar to the one worn by the Perpetrator, and removed him from the train.

In the interim, Officers Visconti and Bishop, having received a radio run of "possibles" in the PATH station, proceeded to that location with Mr. Fontanez in order to see if he could identify anyone. At approximately 2:20 A.M., Officer Visconti accompanied Mr. Fontanez to the train platform and onto the train where he identified Carlos Cajas and Khari Streeter, whom he believed to be the shooter in the green coat. As Mr. Fontanez walked back toward the beginning of the platform, he identified defendant, who at the time was being frisked by Port Authority police officers. Although Officer Visconti testified that none of the detained persons had been handcuffed when Mr. Fontanez identified defendant, Mr. Fontanez later testified at trial that defendant had already been handcuffed when he first saw him, which testimony is consistent with his Grand Jury testimony.

At the time of his arrest, defendant was wearing a reversible aviator-style jacket, with an orange shell, similar to the one described as having been worn by the Perpetrator. Defendant later claimed that when the police initially stopped him, he was wearing the jacket with the orange shell on the inside and the maroon side facing outward, but that the police made him reverse the jacket so that the orange side was facing outward prior to being identified by Mr. Fontanez. Mr. Fontanez' testimony supports that of defendant to the extent that Mr. Fontanez testified that when he first viewed defendant, the orange shell was on the outside. Defendant, at the time of his arrest, was in possession of a single, beat-up .22 caliber bullet which was found in his jacket pocket.

Shortly after his arrest, Officers Pecorale and Martin placed defendant in their patrol car and drove him back to the scene of the shootings, allegedly because they needed instructions from their supervisor, although it is never made clear why the instructions could not have been obtained over the radio. The

officers further maintained, incorrectly, that they did not anticipate coming across any witnesses at the crime scene. A short while later, Officers Bishop and Visconti also transported Mr. Fontanez back to the crime scene.

All but three of the youths who were shot at (two of whom were in the hospital), including the two passing in a car,[1] testified at trial that they were at the crime scene when defendant arrived, handcuffed, in the back of the patrol car. Defendant testified at the CPL article 440 hearing that Mr. Fontanez, in front of other witnesses, pointed at him through the cruiser's window saying that he was the one because "[h]e has the colors on." At some point, Mr. Oquendo began punching the car and was restrained by the officers present at the scene.

Once defendant was brought to the 6th Precinct, he was provided with his *Miranda* warnings, waived the right to counsel and agreed to provide a statement, which was taken by Detective Daniel Massanova. The subsequent lineup procedure, described alternatively at the *Wade/Huntley* hearing as a carousel or merry-go-round, was conducted so that the participants were rotated in and out of the viewing room and seen separately. The reason for this was that defendant was believed to have tuberculosis and none of the fillers, all Police Academy cadets, wanted to be in the same room as defendant.

No lineup photos were taken and police evidence indicated that all of the participants, except for one, were of Hispanic descent. The police cadet fillers all had short hair, befitting their attendance in the Police Academy, whereas defendant and Cajas had "medium" or "normal" length hair which came over the top of their ears. Defendant also correctly points out that while the cadets were neat, fresh and clean-shaven with crew cuts, as they were on their way to the Academy, the suspects had been up all night before the 10:20 A.M. lineup, so the cadets were easily identified.

Detective Massanova testified that after the lineup: Mr. Fontanez identified defendant, Cajas and Streeter; Mr. Everett identified Cajas and defendant; and Mr. Logoa, Mr. Oquendo and Carlos Quinones identified defendant as being at the

---

1. At the time of the incident, two friends of Mr. Fontanez' group, Brian Everett and Michael Logoa, were coincidentially driving by when the confrontation first began and they slowed down to observe. When the men appeared to be separating, and before any shots were fired, the two men in the car drove on.

scene. It was later determined that Mr. Logoa had not, in fact, identified defendant in the lineup and that Detective Massanova was mistaken in his testimony. Mr. Carrasquillo failed to identify anyone.

Streeter was released after the lineup, and his arrest voided, due to a verifiable alibi. Defendant notes, rather strikingly, that every witness that identified defendant at the lineup had seen him in police custody before the lineup and the two witnesses who identified Cajas had seen him in police custody before the lineup, whereas Mr. Carrasquillo, the only lineup witness who had not seen a suspect before the lineup, did not identify anyone.

Defendant Luis Kevin Rojas, pursuant to indictment No. 1868/91 filed on February 22, 1991, was charged with intentional and depraved indifference murder in the second degree, attempted murder in the second degree, criminal facilitation in the second degree, intentional and depraved indifference assault in the first degree, and criminal possession of a weapon in the second and third degrees. Defendant, as well as codefendant Carlos Cajas, was also charged with coercion in the first degree and riot in the second degree.

On August 26, 1991, Justice Paul Bookson denied defendants' motion to suppress, fully crediting the People's witnesses. Justice Bookson held that: Mr. Fontanez' PATH station identification was spontaneous and not police arranged; that defendant was free from restraint at the time of the showups; that once Mr. Fontanez identified defendant, probable cause to arrest existed; that the crime scene viewings were inadvertent and not police orchestrated; and that defendant's suggestiveness challenge to the carousel lineup procedure should be rejected.

At trial, Mr. Fontanez and other witnesses to the shooting identified defendant as the Perpetrator. The lineup identification of defendant was also introduced into evidence. However, the testimony of the youths' descriptions of the Perpetrator varied, with Fontanez acknowledging that he looked different at trial. Accounts of the shooting varied also, for example, Mr. Fontanez testified before the Grand Jury that the man wearing the green coat, not defendant, had fired at the wall and that he had not seen the Perpetrator with the gun, whereas at trial he testified that the Perpetrator fired at the wall before handing the gun to the man in the green coat; Mr. Oquendo originally told police that the man in the green coat had fired

the gun into the air, whereas at trial he could not recall who fired the gun.

Defendant's statement, given to Detective Massanova on the night of his arrest, was also admitted into evidence. Defendant claimed that on the night in issue, he and Cajas took the PATH from New Jersey to the 9th Street Station where they had "browsed" the storefronts on 8th Street prior to eating a late dinner at BBQ's restaurant, also located on 8th Street. At 1:47 A.M., the two men allegedly left the restaurant to return to the PATH station, where they paid the fare, entered the platform and waited 15 to 20 minutes for the train to arrive. As they were about to enter the train, the police arrived, removed Cajas from the train and then defendant.

Defendant was subsequently convicted, after a jury trial, of murder in the second degree (Penal Law § 125.25 [2]), criminal facilitation in the second degree (Penal Law § 115.05), assault in the first degree (Penal Law § 120.10 [3]), and criminal possession of a weapon in the second and third degrees (Penal Law §§ 265.03, 265.02 [4]) and was sentenced to concurrent terms of imprisonment of from 15 years to life, 5 to 15 years, 5 to 15 years, 5 to 15 years, and 2⅓ to 7 years, respectively, which he is currently serving.

It would appear that based on the foregoing evidence, this case reveals prompt, effective police investigative work assisted by a courageous, clear-thinking witness. However, there are several glosses to this evidence and other evidentiary revelations which render this case anything but clear-cut.

In defendant's CPL article 440 motion to vacate the judgment of conviction, serious questions of ineffective assistance of counsel are set forth which occurred not only during the course of the trial but also at the pretrial stage when certain vital items of evidence, which would tend to prove defendant's innocence, were completely overlooked by counsel. Defendant contends that he provided an alibi but that his trial counsel not only failed to give an alibi notice to the People (CPL 250.20 [1]) but indicated during questioning that defendant was, in fact, at the scene. Defendant also points out that neither his trial counsel, nor the prosecutor, interviewed the PATH police officer in charge, Detective Sergeant John Apel, who was instrumental in his arrest and who could substantiate his alibi defense. Defendant further contends that his counsel never visited him at Rikers Island and only visited him once in the holding pen, for approximately one-half hour,

and most of that contact was consumed by counsel urging defendant to take a plea offer. Appellate counsel also notes that trial counsel never investigated defendant's alibi and subpoenaed the New York City Transit Authority rather than PATH for the train station videotape (which, as it turns out, did no harm with regard to available evidence as the camera at the 9th Street Station had no tape in it that night, but does indicate, to some extent, defense counsel's lack of diligence).

The CPL article 440 motion and the subsequent motion to reargue were supported by several affidavits, and hearings addressing both motions were conducted over the course of several days. Following his conviction, defendant obtained new counsel who, in turn, enlisted the services of three retired New York City police officers to investigate the case, Denis O'Sullivan (21 years on the force, 11 as a homicide detective), Michael O'Connor (22 years on the force and retired at the rank of detective, second grade) and Frederick Beck (21 years on the force who retired at the rank of sergeant).

Defendant signed an affidavit submitted in support of his motion (he also testified over the course of two days during the proceedings) in which he avers that after eating at the BBQ restaurant, he and Cajas began walking back to the PATH station at 9th Street, stopping along the way to look into the windows of some stores. Defendant claims, as does Cajas (who also testified at the proceedings) that when they arrived at the station at about 2:00 A.M., they observed a PATH police van at the entrance and as they approached the turnstiles, they saw two PATH police officers escorting a group of individuals in handcuffs whom they assumed were "fare-beaters."

Defendant maintained that he had no money and didn't want to ask Cajas for any because Cajas paid for dinner so he planned, prior to arriving at the PATH station, to jump the turnstile. Once defendant saw the handcuffed prisoners, however, he borrowed the one dollar fare from Cajas and passed through the turnstile, just missing a train that was pulling out.

On the night in question, the "fare beat sweep operation" at the 9th Street Station was being supervised by then PATH Police Sergeant John Apel. Sergeant Apel stated that he recalled observing Cajas and defendant on the morning in issue because they hung around and made an attempt to pass through the turnstiles without paying but then backed off

while other officers, who also were observing them, were hoping they would beat the fare so they could arrest them. At the CPL article 440 hearing, Sergeant Apel testified that Cajas and defendant were in the station approximately 10 minutes before the arrival of New York City police officers.

In response to defendant's CPL article 440 motion, the People supplied defendant with the actual 911 and District Attorney's Squad Tapes (the Squad Tapes) which were not available at the time of trial. The first 911 call, made by the manager of the Bayamo Restaurant located across the street from where the confrontation took place, indicated that the shooting occurred moments before 2:07 A.M. The Squad Tapes demonstrate that Officers Iannotto and Palmer first entered the tunnel of the station at 2:13 A.M. and at 2:15 A.M., one of the officers, believed to be Palmer, radioed Central Dispatch that there might be some "possibles" at the PATH station. From the time of the shootings at 2:07 A.M. to the entry of the officers into the station, there was a time span of six minutes. Sergeant Apel's testimony that he saw defendant in the station approximately 10 minutes before the arrival of the police officers would place defendant and Cajas in the station at approximately 2:03 A.M., which was four minutes before the shooting that occurred five long blocks away.

There was no evidence to support the fact that Cajas and defendant ran from the scene of the shootings to the station as Sergeant Apel testified that the defendant's demeanors were normal, "they were neither breathing nor perspiring heavily and they did not seem overly excited or surprised." Sergeant Apel also testified that defendant and Cajas were loitering outside the turnstile for about five minutes before finally making payment and entering. This behavior is not consistent with the action of two gunmen fleeing from a shooting they have just committed in the vicinity. In addition to Sergeant Apel's testimony on this point, Mr. Fontanez' testimony was that the Perpetrator did not flat-out run from the scene, but pursued a zig-zag course and stopped at least twice. Defendant notes that his private investigators conducted an experiment where they had a "healthy young man" run from the scene of the shooting to the 9th Street PATH station, and that it took 4 minutes and 15 seconds to cover the distance, but that the runner was winded and perspiring heavily upon his arrival.

Sergeant Apel's testimony also supported defendant's claim that he and Cajas just missed a train as they reached the

platform. Pursuant to PATH train logs and the PATH conductor on duty that night, only one passenger train was running in shuttle fashion between Hoboken and 33rd Street in Manhattan. That train, heading uptown, left the 9th Street Station at 2:00 A.M., continued to 33rd Street, then traveled back downtown, returning to 9th Street between 2:14 A.M. and 2:16 A.M. It is undisputed that defendant was arrested after boarding the later train and it is also clear that the train he just missed, and the train Sergeant Apel recalled pulling out as defendant arrived at the platform, must have been the 2:00 A.M. train as no others were running. This places defendant in the station seven minutes prior to the shooting.

Lastly, during the postconviction investigation, it was ascertained that Sergeant Apel recalled fare-beating arrestees being led along the platform before being transported to the World Trade Center PATH headquarters for processing and that he saw defendant and Cajas had entered the station but not yet passed the turnstiles. Defendant also testified that he saw arrestees being led out of the station. Sergeant Apel averred that the PATH officers waited until the 2:00 A.M. train left before moving the farebeaters because the platform would be uncrowded and its "the best time to move them [because] the least amount of people see the police activity." The PATH headquarters log is consistent with Sergeant Apel's recollection as the first prisoners were logged in at the World Trade Center headquarters at 2:12 A.M. Sergeant Apel also stated that it takes approximately 15 minutes to transport prisoners from the 9th Street Station to the World Trade Center.

The evidence released by the People in the form of 911 tapes, Squad Tapes, and the PATH headquarters log coupled with the testimony of Sergeant Apel who placed Cajas and defendant in the PATH station at a time prior to the shootings, certainly raises genuine questions as to defendant's participation in the crime. This evidence was not presented before the jury and could have persuaded them that a reasonable doubt existed as to defendant's guilt.

Defendant's trial counsel, Mr. Fronefield, not only made no effort to investigate the foregoing evidence or defendant's alibi, but further committed numerous errors during the course of the trial which tended to implicate defendant rather than to prove his innocence. At trial, undercutting any alibi defense, was Mr. Fronefield's repeated use of defendant's name when speaking of the Perpetrator. For example, when

cross-examining Mr. Fontanez, the following dialogue took place:

"FRONEFIELD: Now, at the time that [the bumping] occurred, your testimony was that some word [sic] were exchanged. Is that correct?

"FONTANEZ: Correct.

"FRONEFIELD: And those words were between Anthony Oquendo and Mr. Rojas. Isn't that right?

"FONTANEZ: That is correct.

"FRONEFIELD: You saw Mr. Rojas or the man in the orange jacket at that point, isn't that right, somebody in an orange jacket like this one, right?

"FONTANEZ: Correct."

Mr. Fronefield also demonstrated a lack of knowledge of his own client's appearance at the time of his arrest. While cross-examining Officer Iannotto, Fronefield inexplicably insisted that defendant had long hair, despite the testimony of the officer that his hair was of normal length.

"FRONEFIELD: He indeed had long hair, did he not?

"IANNOTTO: Normal length hair, not particularly long.

"FRONEFIELD: Do you recall his hair length being down to his shoulders?

"IANNOTTO: I don't recall it being that long."

The foregoing becomes extremely relevant when viewed in context with the 911 tapes first produced pursuant to the CPL article 440 motion. 911 caller number 12, who was never identified, describes the Perpetrator, the scene of the shootings and the events in great detail. The caller describes the Perpetrator three times during the course of the conversation with the 911 operator as wearing a short orange jacket, white pants and *long hair in a ponytail.* When arrested, defendant had "normal length" hair just over his ears, no ponytail and blue jeans. All of the foregoing, however, was ignored by Mr. Fronefield who chose, as the sole defense, to present character witnesses consisting of defendant's high school counselor, photography teacher and biology teacher.

The right to the effective assistance of counsel is a basic right guaranteed by both the Federal and New York State Constitutions (US Const 6th Amend; NY Const, art I, § 6). There is, however, no set litmus test for determining what constitutes ineffective or inadequate legal representation *(People v Ellis,* 81 NY2d 854, 856 *[habeas corpus denied Ellis v*

*Bartlett,* 1994 WL 319373 (SD NY, June 29, 1994, Sand, J.), *affd* 52 F3d 311]; *People v Baldi,* 54 NY2d 137, 146; *People v Droz,* 39 NY2d 457, 462), but, rather, the law, the evidence and the unique circumstances of each particular case must be viewed as a whole *(People v Rivera,* 71 NY2d 705, 708; *People v Jackson,* 52 NY2d 1027).

In *People v Baldi (supra,* at 146-147), the Court of Appeals, in considering the issue of a defendant's right to adequate counsel, stated: "Our most critical concern in reviewing claims of ineffective counsel is to avoid both confusing true ineffectiveness with mere losing tactics and according undue significance to retrospective analysis. It is always easy with the advantage of hindsight to point out where trial counsel went awry in strategy. But trial tactics which terminate unsuccessfully do not automatically indicate ineffectiveness. So long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met [citations omitted]." *(See also, People v Aiken,* 45 NY2d 394.)

In implementing the aforestated standard, it must be kept in mind that "it is elementary that the right to effective representation includes the right to assistance by an attorney who has taken the time *to review and prepare both the law and the facts relevant to the defense" (People v Droz, supra,* at 462 [emphasis added]; *see also, People v Bennett,* 29 NY2d 462; *McMann v Richardson,* 397 US 759; *People v Rodriguez,* 94 AD2d 805, 807).

■ In the matter before us, based upon a thorough review of the record, we conclude the defendant was deprived of meaningful representation of counsel. Initially, despite defendant's claim of an alibi, and the detailed statements made by both defendant and Cajas to the police on the night of their arrest, defense counsel appears to have made no effort whatsoever to substantiate, or at the very least investigate, defendant's claims. Mr. Fronefield did not go to the BBQ restaurant to interview staff or perhaps look through receipts in order to ascertain defendant's presence and the time thereof; did not interview PATH officers or other PATH personnel (i.e., the train crew) in an effort to determine when the two men arrived at the station, which would have supported defendant's alibi and claim of innocence; made no attempt to support the statements made by defendant to the police and, in fact, attempted to have them ruled inadmissible; failed to

serve the statutorily required notice of an alibi defense; and, in either one or two very brief visits to the defendant in preparation for trial, apparently spent much of the time (1/2 hour total) attempting to convince defendant that he should accept a plea bargain for a crime defendant insisted he did not commit.

Mr. Fronefield also failed to interview or to elicit favorable testimony at trial from William Lytell Davis, an eyewitness to the shooting, whose testimony could have shown that the police may have arrested the wrong person. Mr. Davis, who was working security at the Bayamo Restaurant, testified at the CPL article 440 hearing that he was looking out of the front window of the restaurant when he "saw the incident go down and * * * told the manager to call 911." When the police arrived, Mr. Davis gave them a description of the Perpetrator wearing a flight jacket turned inside out with shoulder-length dirty blond hair in a long ponytail, and of being of average height and kind of stocky. Mr. Davis, upon viewing defendant in the patrol car at the scene, told the police that defendant was definitely the wrong man. Mr. Davis was never brought to the station house to identify defendant in a lineup.

At trial, it was established that defendant is 5 feet, 7 inches tall, weighs 125 pounds and that at the time of his arrest, he had dark hair which just came over the top of his ears. Defendant's counsel never asked Mr. Davis whether defendant was the Perpetrator he saw the night of the shooting.

The "Sprint" reports, which are encoded accounts of 911 calls and the District Attorney's Squad Tapes, were not utilized at all by Mr. Fronefield at trial. One printout indicates that the perpetrators, including one with an orange jacket, were in Washington Square Park minutes after the crime. In addition, the prosecution had disclosed to defense counsel a police report of an interview with eyewitness Laura Mendell, who was not called to testify and who stated that she had encountered the perpetrators in Washington Square Park prior to the shootings. The foregoing information, of which Mr. Fronefield made no use, coupled with defendant's alibi defense, which Mr. Fronefield chose not to pursue, reflects defense counsel's poor preparation, ignorance of the facts and ineffective performance.

With regard to the .22 caliber bullet found in defendant's possession, Mr. Fronefield, rather than call witnesses who

could testify as to the alleged innocent explanation[2] for the bullet's presence, which explanation was never heard by the jury, made statements in his summation which implied defendant may have been at the scene with a .22 caliber gun. For example, defense counsel stated:

"FRONEFIELD: They found Rojas with a .22. Where is the .22 gun? Suggesting maybe a third gun. *Maybe he had a gun.* Was it a .22? I don't know.

"And the balistics [sic] expert himself said * * * it is possible there could have been more guns, two guns." (Emphasis added.)

Later in his summation, defense counsel continued:

"FRONEFIELD: There's also the .22 that they find when they arrest Rojas. They find a .22 on him.

*"Does that suggest he had a gun? I don't know. Maybe it does.* Maybe it doesn't.

"We don't know in fact whether that indeed is the gun that, if you believe beyond a reasonable doubt that he was there and had a gun, whether that was the gun that did any damage to anybody or was just shot in the air. Maybe it was a .22. Maybe he didn't do anything. I don't know." (Emphasis added.)

Remarkably, rather than pursue the alibi and mistaken identity defenses and attempt to explain the presence of a bullet, Mr. Fronefield indicated during summation that defendant probably was at the scene but had not necessarily passed the murder weapon to the shooter because of the fact that only .32 caliber shells were found at the scene. These statements, however, not only contradict defendant's alibi statement to the police, but also subverted defendant's credibility. Bringing the .22 caliber bullet to the jury's attention, therefore, made no sense as Mr. Fronefield failed to elicit the innocent explanation of the bullet's presence, of which he was aware, and instead somehow tied it in with the murder scene and the shootings. It almost appears, at times, that Mr. Fronefield acted as a second prosecutor.

In the final analysis, we find Mr. Fronefield's performance at trial to be seriously lacking as he was unprepared and unversed in both the law and the facts which, in turn, de-

---

**2.** Defendant averred that he had found the beat-up bullet on the ground some weeks before the incident and kept it for good luck, a story which could have been supported by friends who were with him when the bullet was found.

prived defendant of the effective assistance of counsel requiring reversal of the conviction.

■ The entire identification procedure, or rather the series of identifications were both improper and prejudicial. Once the identification and arrest had been made, there was no need for an on-the-scene investigatory showup and defendant should have been kept segregated from the potential lineup witnesses. Instead, as demonstrated by the officers' radio transmissions, defendant was intentionally, not inadvertently, as the People claim, returned for additional showups.

This on-the-scene showup was further tainted by the fact that Fontanez was also returned to the crime scene and his statement, made in front of other witnesses, while pointing to defendant that he was the one because "[h]e has the colors on" may have influenced the others to subsequently identify defendant.

The lineup itself approaches the bizarre. As previously discussed, the fillers were police cadets, clean shaven, crew-cut and neat on the way to the Academy after a good night's sleep. The suspects, on the other hand, had "normal" length hair, had been up all night and were, no doubt, disheveled, probably looking the worse for wear. Since no lineup photos were taken, the People have left appellate review, to a large extent, to speculation.

Under the foregoing circumstances, the on-scene showup and lineup identifications should have been suppressed and an independent source hearing should have been conducted to determine the reliability of the identifications of defendant at trial. It appears that the hearing court was persuaded by the quantitative fact that several identifications of a distinctively dressed person had been made shortly after and close to the crime scene, but the evidence educed should have led the hearing court to broaden its inquiry.

As recently stated by Presiding Justice Murphy of this Court: "The fundamental purpose of the independent source phase of a *Wade* hearing is, of course, to determine, in a case in which there have been impermissibly suggestive police identification procedures, whether there nevertheless exists a sufficiently reliable basis for a witness's inculpatory identification of the defendant at trial." *(People v Foster,* 200 AD2d 196, 199.)

While the testimony of Fontanez was a major part of the People's case, his identification of defendant was also question-

able under the circumstances of this case. Fontanez identified defendant while he was wearing the bright orange jacket, handcuffed and being frisked by the police. The orange windbreaker worn by defendant was a popular jacket at that time. One distributor in Manhattan indicated that it had distributed 10,000 to 15,000 of these jackets and a Long Island distributor indicated that it had distributed 2,000 of the jackets. Further, Mr. Fontanez identified Khari Streeter and was sure he was the gunman in the green coat. Mr. Streeter testified at the CPL article 440 hearing that when he was brought to the precinct, Mr. Fontanez told someone in the group "that's the mother f___r who shot him." However, it turned out that Mr. Streeter had nothing to do with the shootings and was later released by the police. After Streeter's arrest, PATH conductor Anne Marie Sheldon informed one of the officers that Mr. Streeter had boarded her train, and her car, before it reached the 9th Street station and that a female passenger had told her that she had been waiting for the train at the 33rd Street station with Mr. Streeter.

In view of the foregoing, the identifications made at the on-scene showup and at the lineup are suppressed and the matter is remanded for an independent source hearing to determine whether a sufficiently reliable basis for the trial identifications of defendant exists *(People v Foster, supra,* at 200).

Accordingly, the judgment of the Supreme Court, New York County (James Leff, J.), rendered February 26, 1992, which convicted defendant, after a jury trial, of murder in the second degree, criminal facilitation in the second degree, assault in the first degree, and criminal possession of a weapon in the second and third degrees and sentenced him to concurrent terms of 15 years to life, 5 to 15 years, 5 to 15 years, 5 to 15 years, and 2⅓ to 7 years, respectively, is unanimously reversed, on the law and the facts, and the matter is remanded to Supreme Court for an independent source hearing as to the trial identifications and, if warranted, trial.

Motion seeking leave to file an *amicus curiae* brief is granted and motion for an order in advance of decision denied as moot.

ELLERIN, J. P., KUPFERMAN, ASCH and WILLIAMS, JJ., concur.

Judgment, Supreme Court, New York County, rendered on or about February 26, 1992, reversed, on the law and the

facts, and the matter remanded to the Supreme Court for an independent source hearing as to the trial identifications and, if warranted, trial. Motion seeking leave to file an *amicus curiae* brief granted, and motion for an order in advance of decision denied as moot.